SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey  07102-5400
Mark E. Duckstein
(973) 643-7000

and

BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, New York  10022-4689
Jeffrey Q. Smith (*pro hac vice*)
Steven G. Brody (*pro hac vice*)
Susan F. DiCicco (*pro hac vice*)
(212) 705-7000

Attorneys for Defendants Credit Suisse Securities (USA) LLC
(formerly known as Credit Suisse First Boston Corporation) and
Credit Suisse AG, New York Branch (formerly known as
Credit Suisse First Boston, New York Branch)

<div align="center">

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

</div>

| | |
|---|---|
| LLOYDS TSB BANK PLC, | |
| Plaintiff, | Civil Action No. 03-2784 (SDW)(MCA) |
| v. | |
| BANK ONE, N.A., BANC ONE CAPITAL MARKETS, INC., CREDIT SUISSE FIRST BOSTON, CREDIT SUISSE FIRST BOSTON LLC, DELOITTE & TOUCHE LLP, MOODY'S INVESTORS SERVICES, INC., FITCH, INC., J.P. MORGAN CHASE & CO., THOMAS G. MENDELL, HAROLD W. POTE, and LANCE K. POULSEN, | DECLARATION OF Stephen Scotch-Marmo |
| | (Electronically Filed Document) |
| Defendants. | |

Stephen Scotch-Marmo, of full age, hereby declares as follows:

1.      I am an associate of the law firm of Bingham McCutchen LLP, attorneys for

defendants Credit Suisse Securities (USA) LLC, formerly known as Credit Suisse First Boston

Corporation, and Credit Suisse AG, New York Branch, formerly known as Credit Suisse First

Boston, New York Branch (collectively, "Credit Suisse"). I submit this Declaration in support of Credit Suisse's motion for an Order transferring this matter to the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1404(a). I have personal knowledge of the matters set forth herein.

2.     A true and correct copy of the "Participation Agreement (Relating to NPF XII, Inc. Liquidity Asset Purchase Agreement)," between Credit Suisse First Boston, New York Branch and Lloyds TSB Bank PLC, dated March 1, 2001, is attached hereto as Exhibit A.

3.     A true and correct copy of a chart entitled "Address Information for Credit Suisse Employees, Lloyds Employees, and Non-Parties Deposed in NCFE Noteholder Cases," dated April 19, 2012, is attached hereto as Exhibit B.

4.     I supervised the creation of Exhibit B, which lists the Credit Suisse employee, Lloyds employee, and non-party witnesses deposed in the NCFE noteholder cases that were a part of In re Nat'l Century Fin. Enters., Inc. Fin. Inv. Litig., No. 2:03-md-1565 (S.D. Ohio).

5.     For each witness on Exhibit B, we listed the city and state of residence provided by that witness on a questionnaire that the witness received prior to, or at, his or her deposition. In addition, with respect to Credit Suisse employee witnesses, to the extent Credit Suisse had more recent address information, we included such information.

6.     Where no questionnaire was available for a particular witness, or the city and state of residence was not provided on the questionnaire, we used the city and state of residence testified to by the witness at his or her deposition, if available.

7.     For a small number of witnesses, for whom the city and state of residence was not found in either the questionnaire or the testimony of that witness, we used Accurint, a Lexis tool, to identify a current city and state of residence for that witness. For a single witness, whose city

2

and state of residence could not be identified in this manner, we used the last known city and state of employment for that witness.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____
Stephen Scotch-Marmo

Dated:  April 23, 2012

# EXHIBIT A

CONFIDENTIAL

[LLOYDS]

## PARTICIPATION AGREEMENT
(Relating to NPF XII, Inc.
Liquidity Asset Purchase Agreement)

PARTICIPATION AGREEMENT, dated as of March 1, 2001 between CREDIT SUISSE FIRST BOSTON, New York Branch, located at Eleven Madison Avenue, New York, New York 10010-3629 (the "Selling Bank") and LLOYDS TSB BANK PLC, a bank organized under the laws of England, located at 575 Fifth Avenue, 17th Floor, New York, NY 10017 (the "Participant").

1.    Preliminary Statements.  (a) The Selling Bank is a Purchaser under the Liquidity Asset Purchase Agreement more specifically identified in Item 1 of Exhibit A hereto (such Agreement, as amended, supplemented or otherwise modified from time to time, being herein called the "LAPA").  Terms defined in the LAPA but not defined herein shall have their defined meanings when used herein.

(b)    The Selling Bank has agreed pursuant to the LAPA that it will, subject to the terms and conditions of the LAPA, purchase Percentage Interests that the Administrative Agent, as agent for the Issuer, offers for sale, from time to time, on or prior to its Purchase Termination Date.

(c)    As of the effective date of this Participation Agreement set forth in Item 2 of Exhibit A hereto (the "Participation Agreement Effective Date"), the Selling Bank wishes to sell, transfer and convey to the Participant, and the Participant wishes to purchase, acquire and take from the Selling Bank, an undivided participating interest in (i) the Selling Bank's Liquidity Commitment to the extent set forth in Item 3 of Exhibit A hereto, (ii) any Percentage Interests currently owned or hereafter purchased by the Selling Bank pursuant to the LAPA, and (iii) (to the extent the Selling Bank, solely in its capacity as a Purchaser, has an interest therein) the LAPA, the Note Purchase Agreement and the other Related Documents (as defined in the Note Purchase Agreement).  This Participation Agreement sets forth the terms and conditions of such sale and purchase, and of the continuing administration by the Selling Bank of its interest in the LAPA and the purchases of Percentage Interests made or to be made thereunder.

2.    Sale and Purchase of Participating Interest.  Upon and subject to the terms and conditions of this Participation Agreement, the Selling Bank hereby agrees that it will sell, transfer and convey to the Participant, and the Participant hereby agrees that it will purchase, acquire and take from the Selling Bank by way of sale without recourse, except as otherwise provided herein and except for the failure of any representations or warranty of the Selling Bank set forth in Section 12(b) hereof, an undivided participating interest in the percentage and up to the Maximum Liquidity Commitment of the Participant identified in Item 3 of Exhibit A hereto, in (a) the Selling Bank's Liquidity Commitment, including the Selling Bank's obligation pursuant to the Liquidity Commitment to purchase Percentage Interests under the LAPA on and after the Participation Agreement Effective Date, (b) any purchases of Percentage Interests hereafter made by the Selling Bank pursuant to the LAPA and (c) (to the extent the Selling Bank, solely in its capacity as a Purchaser, has an interest therein) the LAPA, the Note Purchase Agreement and the other Related

Doc #30232813.WPD



DEPOSITION EXHIBIT
B MILLER 16
11/16/07
JACK FINZ, CSR

LL_000200

CONFIDENTIAL

Documents; provided, however, that the Participant's participating interest in payments made under the LAPA and the Notes shall be as set forth in Section 4 below.

3.    Purchase Procedure. (a) The Selling Bank will give the Participant notice (by telephone, promptly confirmed in writing) at its address set forth in Item 6 of Exhibit A hereto in respect of any purchase of a Percentage Interest made pursuant to the Liquidity Commitment after the Participation Agreement Effective Date. Such notice to the Participant (each a "Participation Notice") shall be given to the Participant promptly after receipt by the Selling Bank of the related notice as to such purchase of Percentage Interest pursuant to Section 2 of the LAPA and shall set forth (i) the Purchase Price of such Percentage Interest and the Participant's share thereof, and (ii) the Purchase Date. The Selling Bank agrees to provide to the Participant, with respect to each Percentage Interest in which the Participant is required to purchase a participation hereunder, a copy of each notice of purchase, as contemplated by Section 2 of the LAPA, and of each written confirmation of any telephonic notices of a purchase received by the Selling Bank, in each case promptly after the Selling Bank's receipt thereof. The Participant will purchase its participation in each Percentage Interest purchased by the Selling Bank by wire transfer of immediately available U.S. dollars to the account of the Selling Bank set forth in Item 7 of Exhibit A hereto on the date of purchase specified in such Participation Notice no later than 2:00 p.m. (New York City time) in an amount equal to the Participant's share of the Purchase Price of such Percentage Interests, provided that if the Participant receives the applicable Participation Notice after 12:00 noon (New York City time) on the proposed date of purchase, the Participant may wire transfer its share of the Purchase Price by 12:00 noon (New York City time) on the following Business Day. The Participant's participation share of the Purchase Price of such Percentage Interests shall, for any date of purchase, equal the percentage equivalent of a fraction, the numerator of which is the Participant's Maximum Liquidity Commitment identified in Item 3 of Exhibit A hereto and the denominator of which is the Selling Bank's Maximum Liquidity Commitment under the LAPA with respect to the Liquidity Commitment (the Participant's "Commitment Percentage"); provided that in no event shall the aggregate outstanding amount of the Participant's participation exceed its Maximum Liquidity Commitment.

(b)    At any time after the Participant has purchased a participation in any Percentage Interest (including without limitation any Percentage Interest purchased on the Purchase Termination Date) hereunder and the Liquidity Commitment of the Selling Bank has terminated, the Selling Bank, by written notice to the Participant, may fully satisfy its obligations hereunder in respect of such participation in such Percentage Interests by effecting an assignment of a portion of such Percentage Interests from the Selling Bank to the Participant in accordance with the terms and conditions of the LAPA in an amount equal to its Principal Percentage (as hereinafter defined) of the outstanding principal amount of such Percentage Interests. Upon any such assignment, this Participation Agreement shall thereupon be canceled; provided, that (i) notwithstanding any such conversion, the Participant shall retain the right to receive its pro rata share of interest received by the Selling Bank which accrues with respect to periods prior to the effective date of such conversion in accordance with the provisions of Section 4(b) hereof, and no such repurchase or purchase shall affect the Participant's right to receive commitment fees, increased costs or other amounts as otherwise provided in this Participation Agreement, (ii) the Participant shall remain obligated to reimburse the Selling Bank for costs, expenses and disbursements as provided in Section 8 of this

Doc #30232813.WPD                                                              2

CONFIDENTIAL

Participation Agreement which relate to or arise out of periods prior to the effective date of such cancellation and (iii) the Participant shall remain obligated to repay the Selling Bank with respect to payments not received or required to be returned or paid to another Person as provided in Section 4(h) of this Participation Agreement which relate to or arise out of payments made prior to the effective date of such cancellation. In furtherance of the Selling Bank's rights under this Section 3(b), the Participant shall, promptly upon written request of the Selling Bank, execute an Assignment, appropriately completed, with respect to such assignment, and the Participant agrees to furnish to the Liquidity Agent and the Issuer any tax certifications and other documents requested by the Administrative Agent be delivered pursuant to the LAPA in connection with such Assignment.

(c)     The Participant acknowledges and agrees that its obligation to acquire its participation in the Selling Bank's Percentage Interests, in the manner specified herein, is absolutely unconditional and shall not be affected by any circumstance whatsoever, including, without limitation, the occurrence and continuance of any default under the LAPA, the Note Purchase Agreement or any Related Documents, and that each payment for such participation interest hereunder shall be made without any offset, abatement, withholding or reduction whatsoever. The foregoing shall not constitute a waiver by the Participant of any claim it may have against the Selling Bank (which claim may be pursued by the Participant as a separate cause of action and shall not result or be claimed as a setoff or claim against the obligations of the Participant to make the payments herein provided).

4.     Payments on Account of Principal, Interest, Fees and Other Amounts. (a) Whenever the Selling Bank receives any principal payment with respect to a Percentage Interest in which the Participant holds a participation hereunder, the Selling Bank will promptly distribute to the Participant, out of such funds received by the Selling Bank and in the same funds in which such payment is received, the Participant's pro rata share thereof. The Participant's pro rata share of a principal payment with respect to a Percentage Interest for purposes of this Section 4 shall equal the amount of such payment multiplied by the percentage equivalent (the Participant's "Principal Percentage") of a fraction, (a) the numerator of which is the excess of (i) the aggregate outstanding amount of all payments made by the Participant pursuant to Section 2 hereof to purchase its participating interest in the Selling Bank's Percentage Interests, over the amount of principal payments with respect to a Percentage Interest or Transfer Price received by the Participant prior to such date, and (b) the denominator of which is the Purchaser Principal Balance of the Selling Bank relating to the Percentage Interests.

(b)     Whenever the Selling Bank receives a payment of interest in respect of a Percentage Interest in which the Participant holds a participation hereunder, the Selling Bank will promptly distribute to the Participant, out of such funds received by it and in the same funds in which such payment is received, the Participant's pro rata share thereof as specified in Item 4 of Exhibit A attached hereto; provided, however, that the Participant's pro rata share of interest payments will be appropriately adjusted to reflect the period of time during which the Participant's participation has been outstanding on the basis of actual days elapsed and a year of 360 days.

LL_000202

CONFIDENTIAL

(c)     Whenever the Selling Bank receives a payment of the fees owing to the Selling Bank pursuant to Section 3(d) of the LAPA in respect of its Liquidity Commitment in which the Participant holds a participation hereunder and so long as the Participant shall not be in default of its obligations to the Selling Bank under Section 2 hereof, the Selling Bank will promptly distribute to the Participant, out of such funds received by it and in the same funds in which such payment is received, the fees to which the Participant is entitled to as set forth in that certain fee letter, dated the date hereof, between the Selling Bank and the Participant.

(d)     The Participant shall have no interest in, and shall be entitled to receive no part of, any amount paid to the Selling Bank for its own account pursuant to Section 6.02 and Article VII of the Note Purchase Agreement and the Participant shall have no interest in, and shall be entitled to receive no part of, any amounts payable for the account of the Selling Bank (individually or as an agent) under any other provision of the LAPA, the Note Purchase Agreement or any Related Document.

(e)     Payments by the Selling Bank described above in this Section 4 shall be made, if received by the Selling Bank on or before 2:00 p.m., New York City time, on the Business Day on which received, and if received after 2:00 p.m., New York City time, before 12:00 noon, New York City time, on the Business Day following receipt by the Selling Bank, in each case in the type of funds received by the Selling Bank.  Unless otherwise directed by the Participant, all payments to the Participant shall be made to the Participant via wire transfer as provided in Item 7 of Exhibit A hereto.

(f)     The Selling Bank may, but shall not be obligated to, pay to the Participant its share of any payment expected to be received pursuant to the LAPA or otherwise in respect of a Percentage Interest before actual receipt by the Selling Bank of such payment.

(g)     In the event that the Selling Bank makes any payment to the Participant pursuant to the foregoing paragraphs and either the Selling Bank does not receive the corresponding payment under the LAPA, the Note Purchase Agreement or otherwise in respect of a Percentage Interest promptly thereafter, or for any reason such payment is required to be returned or paid to any other Person pursuant to any bankruptcy or insolvency law, any sharing clause in the LAPA, the Note Purchase Agreement or other Related Documents or otherwise, the Participant will repay the Selling Bank upon request the amount paid to the Participant to the extent of the Participant's share of the amount not received or required to be returned or paid to any other Person (and, in the case of an amount not received, interest thereon at the Federal Funds Rate (as defined in the Note Purchase Agreement from time to time in effect).

(h)     THIS AGREEMENT SHALL NOT BE CONSTRUED TO ESTABLISH, AND THERE IS HEREBY DISCLAIMED, ANY FIDUCIARY, TRUST OR PARTNERSHIP RELATIONSHIP BETWEEN THE SELLING BANK AND THE PARTICIPANT. Except as expressly set forth herein, the sole liability of the Selling Bank to the Participant shall be to distribute promptly, as and when received by the Selling Bank, as stated above in this Section 4, the Participant's share of payments to which its participation is entitled.

Doc #30232813.WPD

4

LL_000203

CONFIDENTIAL

5.     Default. If either party shall default in paying any amount owing from it to the other party pursuant to this Participation Agreement when due, the defaulting party shall remain obligated to pay such amount and further agrees to pay all reasonable costs incurred by the nondefaulting party in connection with such default and the costs of enforcing this Participation Agreement, together with interest on the amount in default for each day (after as well as before judgment) at a rate per annum equal to (x) on and prior to the second Business Day after such payment was due, the Federal Funds Rate and (y) thereafter, the Alternate Base Rate in effect on such day.

6.     Delivery of Documents and Information. The Selling Bank agrees to furnish to the Participant copies of all reports and documents furnished to the Purchasers, including, without limitation, all reports and documents of the types previously received by the Participant in its capacity as a Purchaser prior to giving effect to the assignment referred to in paragraph 1(b) of this Participation Agreement; provided that the Selling Bank assumes no responsibility with respect to the truth, correctness, authenticity, legality, validity or enforceability thereof.

7.     Modification of Transaction Documents. (a) Without the prior written consent of the Participant, so long as the Participant is not in default under this Participation Agreement, the Selling Bank will not agree to (i) extend any date specified for any payment of principal of, or interest on any such Percentage Interests, (ii) reduce the amount of any such payment, (iii) reduce the rate of or to subordinate the right to receive any principal or interest payable to the Selling Bank thereunder in which the Participant has an interest, (iv) waive the occurrence of any Event of Default under the Master Indenture or the Series Supplement, or (v) consent to any amendment of the definitions of "Event of Default," "Interest Reserve," "Specified Credit Reserve Balance," "Specified Interest Shortfall Reserve Requirement," "Specified Offset Reserve Balance" or "Specified Series Equity Account Balance," as such terms relate to the Series 2000-4 Notes, or any covenant of the Issuer or the Servicer contained in the Series Supplement or the Master Indenture. The Participant agrees to notify the Selling Bank in writing within 20 days after it receives notice from the Selling Bank of whether or not the Participant consents to, or agrees to be bound by, the proposed consent, approval, extension or reduction of the type described in this clause (a). Failure to so notify the Selling Bank shall be deemed to constitute a withholding by the Participant of such consent and agreement. The Selling Bank agrees to deliver confirmation to the Participant of the result of any consent, approval, extension or reduction of the type set forth in this clause (a) promptly after the effectiveness thereof; provided that the failure of the Selling Bank to deliver any such notice shall not affect the effectiveness of any such consent, approval, extension or reduction. The Participant acknowledges and agrees that the Selling Bank reserves the right, in its sole and absolute discretion, in each instance, without prior notice to the Participant, to grant or withhold any other consents or approvals or to take or decline to take any other action (including without limitation extension of the applicable Purchase Termination Date) with respect to any or all of its Liquidity Commitment, other than the portion thereof in which the Participant holds a participation hereunder, or as Liquidity Agent, and the Participant will have no vote or right of approval or consent with respect to any of the foregoing.

(b)     The Selling Bank shall have the right to extend the Purchase Termination Date applicable to the Liquidity Commitment in which the Participant holds a participation hereunder; provided that unless the Participant has consented to such extension in writing and agreed to

Doc #30232813.WPD                                                5

LL_000204

CONFIDENTIAL

maintain its participation hereunder in full force and effect with respect to such extension, the participation hereunder shall be deemed to be canceled on the Purchase Termination Date then in effect without regard to such extension in accordance with Section 16 below. The Participant agrees to notify the Selling Bank in writing within 20 days after it receives notice from the Selling Bank of whether or not the Participant consents to, and agrees to be bound by, a proposed extension of the Purchase Termination Date applicable to the Liquidity Commitment (provided that in no event shall the Participant be required to respond to any such notice from the Selling Bank more than 60 days prior to the then-current Purchase Termination Date). Failure to so notify the Selling Bank shall be deemed to constitute a withholding by the Participant of such consent and agreement. The Selling Bank agrees to deliver notice to the Participant of any extension of the Purchase Termination Date promptly after the effectiveness thereof; provided that the failure of the Selling Bank to deliver any such notice shall not affect the effectiveness of any such extension. The Participant acknowledges that the Selling Bank may be obligated to purchase Percentage Interests on the Purchase Termination Date in respect of its Liquidity Commitment in which the Participant holds a participation hereunder and that the Participant will be required to fund its participation hereunder in respect of such Percentage Interests. The Selling Bank shall have the right in its sole discretion to decline to extend the Purchase Termination Date applicable to the Liquidity Commitment in which the Participant holds a participation hereunder.

8.    Sharing Expenses. The Participant agrees that it will on request reimburse the Selling Bank, to the extent of its participation in the Selling Bank's Percentage Interests and the Liquidity Commitment, for any and all costs, expenses and disbursements which may be incurred or made by the Selling Bank (in its capacity as a Purchaser) in connection with the LAPA, the Note Purchase Agreement, any Related Document or any Percentage Interest, including, without limitation, the Selling Bank's share of any payments to the Liquidity Agent pursuant to Section 11(c) of the LAPA, and any action which may be taken by the Selling Bank to collect the same or preserve or enforce rights thereunder, for which the Selling Bank is not reimbursed by the Issuer or another party in accordance with the LAPA.

9.    Sharing Payments. If the Selling Bank or the Participant shall at any time receive payment on account of all or part of its share of amounts outstanding under the LAPA or the Percentage Interests, including, without limitation, by way of set-off, in a greater proportion than the payments made on account of the share of the other party hereto, such party receiving such greater proportionate payment shall make payment in cash to the other party hereto in such amounts so that after such payment the amount unpaid on the interest of each party hereto in such outstanding amounts becomes proportionate to the respective interests of the parties therein (based on the ratio of the Participant's Maximum Liquidity Commitment to the Selling Bank's Maximum Liquidity Commitment under the LAPA) prior to receipt by any party of a disproportionate payment. In the event that any such payment is disturbed by legal process or otherwise, appropriate further adjustments shall be made.

10.    Limitation on the Liability of the Selling Bank. (a) No fiduciary relationship exists between the parties hereto. The Selling Bank shall not be liable to the Participant for any error in judgment or for any action taken or omitted to be taken by the Selling Bank except for gross negligence or willful misconduct of the Selling Bank. Subject to the preceding sentence, the Selling

6

LL_000205

CONFIDENTIAL

Bank will exercise the same care in administering the LAPA as the Selling Bank exercises with respect to similar facilities entered into by the Selling Bank for its own account and risk, and the Selling Bank shall have no further responsibility to the Participant. Without limiting the foregoing, the Selling Bank may rely upon the advice of counsel concerning legal matters and upon any written document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons.

(b) The Selling Bank shall not be required to make any inquiry concerning the Company, the Issuer, the Servicer or any of their respective obligations or any other Person's obligations to the Selling Bank or others under the LAPA, any Percentage Interest, the Note Purchase Agreement, any Related Document or any related document, or to inspect the properties or books and records of the Company, the Issuer or any such Person. The Selling Bank (i) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties and representations made in or in connection with the LAPA, any Percentage Interest, the Note Purchase Agreement, any Related Document or any related document or the execution, legality, validity, enforceability, genuineness, perfection, sufficiency or value of the LAPA, any Percentage Interest, the Note Purchase Agreement, any Related Document or any related document, and (ii) makes no representation or warranty and assumes no responsibility with respect to the LAPA, any Percentage Interest, the Note Purchase Agreement, any Related Document or any related document, the financial condition of the Company or the Issuer or the performance or observance by the Company, the Servicer or the Issuer of any of their respective obligations under the LAPA, any Percentage Interest, the Note Purchase Agreement, any Related Document or any related document. The Selling Bank shall not have any duty or responsibility to provide the Participant with any credit or other information concerning the affairs, financial condition or business of the Company, the Servicer, the Issuer or any other parties to the LAPA, any Percentage Interest, the Note Purchase Agreement, any Related Document or any related document which may come into the possession of the Issuer, the Company, the Servicer or any of their affiliates.

(c) The Participant acknowledges that the Selling Bank may accept deposits from, lend money to, and generally engage in any kind of business with the Issuer, the Company, the Servicer or any affiliate thereof as if it were not a party hereto. The Participant further acknowledges that the Selling Bank acts as the Liquidity Agent under the LAPA. The Selling Bank shall not, by virtue of its acting in any such capacities, be deemed to have duties or responsibilities hereunder or be held to a standard of care in connection with the performance of its duties hereunder other than as expressly provided in this Participation Agreement. The Selling Bank may act as agent in each of the aforesaid capacities without regard to and without additional duties or liabilities arising from its role as Selling Bank hereunder or arising from its acting in any other capacity.

11. <u>Transferability</u>. The Participant represents that it is acquiring its participating interests hereunder for its own account in the ordinary course of its banking business and not with a view to any sale or other distribution thereof. The Participant agrees that it will not sell, assign, convey, subparticipate or otherwise dispose of, or create or permit to exist any lien or security interest upon all or any part of, any of its participating interests hereunder without the prior written consent of the Selling Bank and in a manner in compliance with the terms and conditions of the LAPA applicable to Participation Interests thereunder and of the Note Purchase Agreement.

CONFIDENTIAL

12.   Representations. (a) The Participant represents to the Selling Bank that it has
entered into this Participation Agreement on the basis of its own credit evaluation of, or independent
commercial relationship with, the Company, the Servicer and the Issuer; that the Selling Bank has
not made any representations or warranties to the Participant (other than representations specifically
made in this Section 12) and that no act hereafter taken by the Selling Bank, including any review
of the affairs of the Company, the Issuer, the Servicer or any party to the LAPA, the Note Purchase
Agreement, any Related Document or any related document, shall be deemed to constitute any
representation or warranty by the Selling Bank to the Participant (other than representations
specifically made in this Section 12).  Notwithstanding the foregoing, the Selling Bank shall have
responsibility for information prepared by it and furnished to the Participant in connection with this
Agreement. The Participant represents and warrants to, and agrees with, the Selling Bank that it has
made and will continue to make, independently and without reliance upon the Selling Bank, and
based on such documents and information as it has deemed appropriate, its own appraisal of and
investigation into the financial condition, creditworthiness, affairs, status and nature of the Company,
the Issuer and each other party to the LAPA, the Note Purchase Agreement, any Related Document
or any related document in connection with its determination to enter into, and to take actions under,
this Participation Agreement. The Participant hereby further represents and warrants to the Selling
Bank that this Participation Agreement has been duly authorized, executed and delivered by it and
constitutes its legal, valid and binding obligation enforceable in accordance with its terms subject,
as to enforcement, to applicable bankruptcy, insolvency, reorganization, moratorium,
conservatorship or similar laws now or hereafter in effect affecting the Participant and except as such
enforceability may be limited by general principles of equity (whether considered in a proceeding
at law or in equity).

(b)   The Selling Bank represents to the Participant that, except as permitted by
Section 10(d) hereof, each Percentage Interest in which the Participant holds a participation
hereunder is or will, at the time such participation is purchased pursuant to Section 2 hereof, be free
and clear of any adverse claims created by or arising out of claims against the Selling Bank, except
as otherwise set forth in the LAPA or this Participation Agreement. The Selling Bank hereby further
represents and warrants to the Participant that this Participation Agreement has been duly authorized,
executed and delivered by it and constitutes the Selling Bank's legal, valid and binding obligation
enforceable in accordance with its terms subject, as to enforcement, to applicable bankruptcy,
insolvency, reorganization, moratorium, conservatorship or similar laws now or hereafter in effect
affecting the Selling Bank and except as such enforceability may be limited by general principles
of equity (whether considered in a proceeding at law or in equity).

13.   Notices. All instructions, notices and other communications to be given to
any party hereto shall be in writing (unless otherwise specifically provided herein) and shall be
delivered or sent by first-class mail or by telecopier (receipt confirmed), and shall be deemed to be
given for purposes of this Participation Agreement on the day when delivered or sent (except, if sent
by first-class mail, they shall be deemed to be given on the fifth Business Day after the day on which
mailed) to the intended party at its address or telecopier number specified in Item 6 of Exhibit A
hereto (or as such party may specify to the other party in writing).

Doc #30352813.WPD                                    8

LL_000207

CONFIDENTIAL

14.   Amendments; Counterparts. No amendment, modification or waiver of any provision of this Participation Agreement shall be effective unless the same shall be in writing and signed by the Selling Bank and the Participant and consented to by the Administrative Agent. The Participation Agreement may be executed in one or more counterparts, and by different parties hereto on the same or separate counterparts, each of which shall be deemed an original instrument.

15.   Governing Law.  THIS PARTICIPATION AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAW OF THE STATE OF NEW YORK.

16.   Cancellation.   (a)  The Selling Bank reserves the right to cancel the Participant's participation hereunder with respect to future purchases of Percentage Interests and terminate this Participation Agreement (except as provided in the next sentence) upon 10 days prior written notice to the Participant in the event that the Participant shall (i) default on any monetary obligation or material non-monetary obligations hereunder, (ii) cease to be either organized under the laws of the United States or a State thereof or otherwise entitled to a complete exemption from U.S. federal income tax withholding on all payments receivable by the Participant hereunder and under the LAPA, (iii) have demanded any compensation pursuant to Section 4(d) of this Participation Agreement, (iv) have failed within 20 days of its receipt of a written request (by telecopy (receipt confirmed) or by certified or registered mail) from the Selling Bank therefor to consent to any other matter relating to the LAPA, any Percentage Interests, the Note Purchase Agreement, any Related Document or related documents requiring the consent of the Participant pursuant to Section 7 hereof or (v) the rating assigned to the short-term unsecured debt of the Participant by Moody's shall cease to be rated at least P-2 or the rating assigned to the short-term unsecured debt of the Participant by S&P shall cease to be rated at least A-2 (either such occurrence, a "Participant Downgrade Event"). After any such cancellation pursuant to this Section 16(a), the sole obligation of the Selling Bank to the Participant will be to distribute to the Participant any amount to which it is entitled pursuant to Section 4 of this Participation Agreement (other than the commitment fees, if any, accruing with respect to periods after the cancellation date), and the Participant shall have no further right or obligation after the date of such cancellation to participate in Percentage Interests; provided, that, so long as the principal amount of any participation by the Participant in any Percentage Interests or any interest thereon remains owing to the Participant (i) the Selling Bank agrees, so long as the Participant is not in default under this Participation Agreement, that the Selling Bank will seek and obtain the Participant's prior written consent (which shall be granted or denied by the Participant in a writing received by the Selling Bank within ten (10) Business Days of the Selling Bank's receipt of a written request therefor or such lesser time as may be imposed upon the Selling Bank pursuant to the LAPA or any related document and set forth by the Selling Bank in its request, the failure to receive such grant or denial within such time period being a waiver of the Participant's right to consent in such instance) before the Selling Bank shall agree to (A) extend any date specified for any payment of principal of, or interest on any such Percentage Interests, (B) reduce the amount of any such payment or (C) reduce the rate of or to subordinate the right to receive any principal or interest payable to the Selling Bank thereunder in which the Participant has an interest, and (ii) the Participant shall remain obligated to reimburse the Selling Bank for costs, expenses and disbursements and in respect of payments as provided in Section 8 of this Participation Agreement which relate to or arise out of periods prior to the effective

Doc #30232813.WPD                                            9

LL_000208

CONFIDENTIAL

date of such cancellation or, to the extent of its continuing participation in the Selling Bank's Percentage Interests, which relate to or arise out of periods thereafter.

(b)      In the event that (i) the Selling Bank shall have elected to extend the Purchase Termination Date applicable to the Liquidity Commitment in which the Participant holds a participation hereunder without the written consent of the Participant, or (ii) the Selling Bank shall assign the entire Liquidity Commitment and all Percentage Interests advanced thereunder pursuant to Section 7 of the LAPA, the Participant's participation hereunder and this Participation Agreement shall terminate effective as of the Purchase Termination Date otherwise in effect without giving effect to such extension or as of the effective date of such assignment, as applicable. In either such event, on the effective date of such termination the Selling Bank will repurchase, or cause a third party to purchase, from the Participant the outstanding participation hereunder for an amount equal to the Participant's Principal Percentage times the Purchaser Principal Balance of all Percentage Interests owned by the Selling Bank. After any such termination and cancellation pursuant to this Section 16(b), the sole remaining obligation of the Selling Bank to the Participant will be to distribute to the Participant any amount to which it is entitled pursuant to Section 4 (other than Section 4(a)) of this Participation Agreement, and the Participant shall have no further right or obligation after the date of such cancellation to participate in Percentage Interests; provided, that, the Participant shall remain obligated to reimburse the Selling Bank for costs, expenses and disbursements and in respect of payments as provided in Section 8 of this Participation Agreement which relate to or arise out of periods prior to the effective date of such cancellation.

17.      Cash Collateral Account.  If a Participant Downgrade Event shall have occurred, the Participant shall secure its payment obligations under this Participation Agreement (including, without limitation, its obligations to purchase participations hereunder) by depositing the Cash Collateral Required Amount, as defined below (determined as of the date of such deposit), into an account (which, at the election of the Selling Bank, may be a trust account) in the Selling Bank's name at the Selling Bank or at another commercial bank or trust company having a short-term unsecured debt or certificate of deposit rating of at least P-2 from Moody's and A-2 from S&P (the "Participant Cash Collateral Account") within five (5) Business Days of the occurrence of such Participant Downgrade Event. The Selling Bank shall have sole dominion and control over the Participant Cash Collateral Account. In the event that, from time to time, the Cash Collateral Required Amount shall increase (including any increase which follows a prior reduction thereof), the Participant within five (5) Business Days following such increase shall make an additional deposit into the Participant Cash Collateral Account sufficient so that the amount on deposit therein equals the Cash Collateral Required Amount (determined as of the date of such deposit); provided that if such increase is by reason of an amount payable to the Participant hereunder in respect of its participation, such additional deposit shall be immediately due and payable and the Selling Bank is hereby irrevocably authorized to make such deposit for the account of the Participant from amounts otherwise payable to the Participant hereunder. The "Cash Collateral Required Amount" shall, at any time, equal the lesser of (a) the Maximum Liquidity Commitment of the Participant, and (b) (i) the product of (A) the Participant's Commitment Percentage, times (B) the Selling Bank's Credit Exposure (as defined below), minus (ii) the excess of (A) the aggregate outstanding amount of all payments made by the Participant pursuant to Section 2 hereof to purchase its participating interest in the Selling Bank's Percentage Interests, over (B) the aggregate amount of payments received by

Doc #30352813.WPD                                                           10

CONFIDENTIAL

the Participant hereunder representing its share of (x) principal payments in respect of the Percentage Interests, (y) Transfer Price or (z) amounts repaid to the Selling Bank in respect of any Supplemental Purchase Price paid by the Selling Bank pursuant to the LAPA. The Selling Bank's "Credit Exposure" shall, at any time, equal the sum of (i) its Maximum Liquidity Commitment under the LAPA, plus the portion of the Outstanding Balance held in its capacity as a Purchaser under the LAPA, plus (iii) any portion of the aggregate Supplemental Purchase Price paid by the Selling Bank pursuant to the LAPA which has not been repaid to the Selling Bank. Amounts on deposit in the Participant Cash Collateral Account shall be invested and reinvested in Permitted Investments maturing on the Business Day next preceding the date on which Notes or Liquidity Advances mature at the discretion of the Selling Bank. Earnings on amounts on deposit in the Participant Cash Collateral Account shall be retained therein until the amount on deposit therein equals the Cash Collateral Required Amount, and any excess shall be paid to the Participant promptly after the receipt thereof (in the form of cash) in the Participant Cash Collateral Account. Amounts on deposit in the Participant Cash Collateral Account may be withdrawn therefrom by the Selling Bank without further notice to the Participant but solely to be applied to fund payments due from the Participant under this Participation Agreement. Amounts remaining on deposit in the Participant Cash Collateral Account (or, if less, the amount available to be withdrawn without liquidation of an investment therein) shall be repaid to the Participant (i) on any day, to the extent the amount on deposit exceeds the Cash Collateral Required Amount and (ii) on the date on which the Participant's obligations to purchase Percentage Interests shall have terminated in accordance with the terms hereof and the Participant shall have paid all amounts payable by it hereunder as of such date. The Purchaser's deposit of funds into the Participant Cash Collateral Account shall not constitute a discharge of any of the Participant's obligations under this Participation Agreement (except as and to the extent such deposited funds are applied as provided in this subsection (b) to fund the Participant's obligations). The parties agree that amounts on deposit in the Participant Cash Collateral Account are invested as provided herein for the Participant's account for Federal and other tax purposes.

18. <u>Jurisdiction: Waiver of Jury Trial</u>. (a) The Participant hereby agrees that any LEGAL ACTION OR PROCEEDING AGAINST THE PARTICIPANT WITH RESPECT TO THIS PARTICIPATION AGREEMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK as the Selling Bank may elect, and, by execution and delivery hereof, the Participant accepts and consents to, for itself and in respect to its property, generally and unconditionally, the jurisdiction of the aforesaid courts and agrees that such jurisdiction shall be exclusive, unless waived by the Selling Bank in writing, with respect to any action or proceeding brought by it against the Selling Bank. Nothing herein shall limit the right of the Selling Bank to bring proceedings against the Participant in the courts of any other jurisdiction.

(b) EACH OF THE PARTICIPANT AND THE SELLING BANK HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS PARTICIPATION AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN), OR ACTIONS OF THE PARTICIPANT OR THE SELLING

LL_000210

CONFIDENTIAL

BANK. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE SELLING BANK GRANTING THE PARTICIPATION TO THE PARTICIPANT HEREUNDER.

LL_000211

CONFIDENTIAL

IN WITNESS WHEREOF, the parties hereto, by their duly authorized officers, have executed this Participation Agreement as of the date first above written.

CREDIT SUISSE FIRST BOSTON,
New York Branch

By: _____
Title: 
                ALBERTO ZONCA
                VICE PRESIDENT
By: _____
Title:
                Associate

LLOYDS TSB BANK PLC

By: _____
Name:
Title:

By: _____
Name:
Title:

CONSENTED TO:

CREDIT SUISSE FIRST BOSTON,
NEW YORK BRANCH, as Administrative Agent

By: _____
Title:
                ALBERTO ZONCA
                VICE PRESIDENT
By: _____
Title:
                Matthew J. Monaco
                Associate

LL_000212

CONFIDENTIAL

IN WITNESS WHEREOF, the parties hereto, by their duly authorized officers, have executed this Participation Agreement as of the date first above written.

CREDIT SUISSE FIRST BOSTON,
New York Branch

By: _____
          Title:

By: _____
          Title:

LLOYDS TSB BANK PLC

By: _____
          Name:          BRIAN MAYOR
          Title:         EXECUTIVE OFFICER
                              M350

By: _____
          Name:
          Title:         AMY VESPASIANO
                              Director
                         STRUCTURED FINANCE
                              V024

CONSENTED TO:

CREDIT SUISSE FIRST BOSTON,
NEW YORK BRANCH, as Administrative Agent

By: _____
          Title:

By: _____
          Title:

Doc #3021261.WPD                    13

LL_000213

CONFIDENTIAL

EXHIBIT A
TO
PARTICIPATION AGREEMENT

This Exhibit A completes Items of
Information in the Participation
Agreement to which this Exhibit A is attached.

1.   Name and Date of Agreement:

Liquidity Asset Purchase Agreement, dated as of February 28, 2001 among Credit
Suisse First Boston, New York Branch, as Liquidity Agent, Credit Suisse First
Boston, New York Branch, as Purchaser, Alpine Securitization Corp., and Credit
Suisse First Boston, New York Branch, as Administrative Agent

2.   Participation Agreement Effective Date: February 28, 2001

3.   Amounts (as of Participation Agreement Effective Date):
Liquidity Commitment of Selling Bank (with Purchase Termination Date of
December 26, 2001)

    (a)  Liquidity Commitment            $68,000,000.00
    (b)  Assigned Share                 100%
    (c)  Participant's
        Maximum Liquidity Commitment   $68,000,000.00

4.   Participant's Pro Rata Share of Interest

The Participant's pro rata share of interest in respect of the Percentage Interests (in
which the Participant holds a participation hereunder) for any period received by the
Selling Bank shall equal the Participant's Principal Percentage of such interest.

---

1

LL_000214

CONFIDENTIAL

5.   Notice Addresses:

SELLING BANK:

Credit Suisse First Boston
New York Branch
Eleven Madison Avenue
New York, New York 10010-3629
Attn: Asset Finance Department
Telephone:      (212) 325-9075
Telecopier:     (212) 325-4519
Reference:      NPF XII

PARTICIPANT:

Lloyds TSB Bank plc
17th Floor
575 Fifth Avenue
New York, NY 10017
Attn: Patricia Kilian, Vice President
Tel:            (212) 930-8914
Fax:            (212) 930-5098
Reference: NPF XII, Inc.

6.   Payment Instructions:

SELLING BANK:

Bank Name:        Bank of New York
Bank Address:     New York, New York
ABA Number:       021-000-018
Account Number:   890-038-7025
Account Name:     Alpine Iss/Redemption
Further
Credit to:        Credit Suisse First Boston, New York Branch
Reference:        NPF XII, Inc.

PARTICIPANT:

Name:             Bank of America, New York
ABA Number:       026009593
Account Number:   6550101938
Account Name:     Lloyds TSB Bank plc, Miami
Attention:        Patricia Kilian, Vice President
Reference:        NPF XII, Inc.

Doc #30232813.WPD

2

# EXHIBIT B

ADDRESS INFORMATION FOR CREDIT SUISSE EMPLOYEES,   4/19/2012
LLOYDS EMPLOYEES, AND NON-PARTIES DEPOSED IN NCFE NOTEHOLDER CASES

| Name | Affiliation | City and State of Residence[1] |
|---|---|---|
| Alan Alperin | Credit Suisse | Kentfield, CA 94904 |
| Jessica Bergman | Credit Suisse | New York, NY 10012 |
| Helen Cheung | Credit Suisse | New York, NY 10128 |
| Jonathan Clark | Credit Suisse | McLean, VA 22102 |
| Thomas Cornacchia | Credit Suisse | Darien, CT 06820 |
| Michael Criscito | Credit Suisse | Rumson, NJ 07760 |
| Anthony DeLuise | Credit Suisse | New York, NY 10028 |
| Joseph Donovan | Credit Suisse | Armonk, NY 10504 |
| Todd Fasanella | Credit Suisse | Rye, NY 10580 |
| Michael Gaffney | Credit Suisse | Bronxville, NY 10708 |
| John Gans | Credit Suisse | New York, NY 10021 |
| Anthony Giordano | Credit Suisse | Hoboken, NJ 07030 |
| Michael Guptan | Credit Suisse | New York, NY 10023 |
| Graham Hunt | Credit Suisse | Cranbury, NJ 08512 |
| David Hurwitz | Credit Suisse | New York, NY 10024 |
| Thomas Irwin | Credit Suisse | Montvale, NJ 07645 |
| Mark Lengel | Credit Suisse | Woodcliff Lake, NJ 07677 |
| Keith Lurie | Credit Suisse | Larchmont, NY 10538 |
| Neil McPherson | Credit Suisse | Huntington, NY 11743 |
| Bruce Miller | Credit Suisse | Plandome, NY 11030 |
| Matthew Monaco | Credit Suisse | Aquebogue, NY 11931 |
| Ted Moran | Credit Suisse | New York, NY 10011 |
| Michael Murray | Credit Suisse | Darien, CT 06820 |
| Robert O'Brien | Credit Suisse | New York, NY 10028 |
| Gregory Richter | Credit Suisse | Bronxville, NY 10708 |
| Oliver Sarkozy | Credit Suisse | New York, NY 10013 |
| Jon Seed | Credit Suisse | Evanston, IL 60201 |
| Heather Smith | Credit Suisse | New York, NY 10023 |
| Laura Strothmann | Credit Suisse | New York, NY 10024 |
| Alan Tyson | Credit Suisse | Morristown, NJ 07960 |
| Bryan Whalen | Credit Suisse | Pacific Palisades, CA 90272 |
| James Xanthos | Credit Suisse | Flushing, NY 11354 |
| Richard Conway | Lloyds | Cambridgeshire, United Kingdom |
| Mark Grant | Lloyds | Surrey, United Kingdom |
| John Harchuck | Lloyds | New York, NY 10128 |
| David Hunt | Lloyds | Surrey, United Kingdom |
| Peter Kernick | Lloyds | Teddington, United Kingdom |
| Roger King | Lloyds | Miami Shores, FL 33138 |
| Brian Mayor | Lloyds | Florence, MA 01062 |
| Gavin Rees | Lloyds | New York, NY 10016 |
| Dilian Schulz | Lloyds | Davie, FL 33314 |
| Roger Seggins | Lloyds | Surrey, United Kingdom |
| Tamara Swaby | Lloyds | Mount Vernon, NY 10550 |
| Amy Vespasiano | Lloyds | New York, NY 10025 |
| Thea Watkins | Lloyds | New York, NY 10027 |
| David Coles | Alvarez & Marsal | New York, NY 10075 |
| Alexander Roever | Banc One Capital | Wilmette, IL 60091 |

[1] City and state residence information for witnesses, unless otherwise noted, comes from the Witness Questionnaire, deposition testimony, or use of Accurint, a Lexis tool. To the extent Credit Suisse had more recent address information for Credit Suisse witnesses, that information was utilized.

ADDRESS INFORMATION FOR CREDIT SUISSE EMPLOYEES,
LLOYDS EMPLOYEES, AND NON-PARTIES DEPOSED IN NCFE NOTEHOLDER CASES

4/19/2012

| Name | Affiliation | City and State of Residence[1] |
|------|-------------|-------------------------------|
| Jeffrey Ayres | Bank One | Indianapolis, IN 46220 |
| Bruce Baird | Bank One | Washington, D.C., 20016 |
| Darlington Cummings | Bank One | Reynoldsburg, OH 43068 |
| Thomas Hyland | Bank One | Columbus, OH 43202 |
| Jeffrey Kinney | Bank One | Lombard, IL 60148 |
| Charles McLaughlin | Bank One | Evergreen Park, IL 60805 |
| John Rothrock | Bank One | Gahanna, OH 43230 |
| Maria Ruiz [2] | Bank One | Chicago, IL |
| Thomas Mendell | Beacon | New York, NY 10075 |
| Eric Wilkinson | Beacon | West Sussex, United Kingdom |
| Alejandro Berney | Citi | Beccar, Argentina |
| Barry Winter | Citi | Melville, NY 11747 |
| Brian Gerevics | Deloitte | Columbus, OH 43240 |
| Robert Harbrecht | Deloitte | Columbus, OH 43085 |
| Douglas Hart | Deloitte | Allendale, NJ 07401 |
| Brian Spires | Deloitte | New Albany, OH 43054 |
| Adam Cohen | Deutsche Bank | Old Tappan, NJ 07675 |
| Donna Talbot | Drs. Comm. Healthcare | Alameda, CA 94501 |
| John Bella | Fitch | New York, NY 10014 |
| Corey Bresnahan | Fitch | New York, NY 10024 |
| Sandra Claghorn | Fitch | New York, NY 10022 |
| Wendy Cohn | Fitch | New York, NY 10075 |
| Kevin Duignan | Fitch | Bronxville, NY 10708 |
| Kevin Healey | Fitch | Moraga, CA 94556 |
| Brigid Keyes Fitzgerald | Fitch | Downers Grove, IL 60515 |
| Margaret Manda | Fitch | Northfield, IL 60093 |
| James Nadler | Fitch | New York, NY 10022 |
| Lorna Gleason | GMAC | Minneapolis, MN 55437 |
| Tammy Hamzehpour | GMAC | Bloomington, MN 55438 |
| Gregory Schultz | GMAC | Minneapolis, MN 55437 |
| Richard Stahl | GMAC | Plymouth, MN 55447 |
| John Costa | ING | Stamford, CT 06903 |
| Robert Novick | ING | Mamaroneck, NY 10543 |
| Vada Battaglia | JPMorgan | Berkeley, CA 94705 |
| Jeannie Chin | JPMorgan | New York, NY *** |
| Jennifer Cupo | JPMorgan | San Clemente, CA 92673 |
| Joseph Giordano | JPMorgan | Foxboro, MA 02035 |
| Craig Kantor | JPMorgan | Livingston, NJ 07039 |
| Thomas Mackay | JPMorgan | Merrick, NY 11566 |
| Jennifer McCourt | JPMorgan | Midland Park, NJ 07432 |
| Marie Merritt | JPMorgan | Park Ridge, NJ 07656 |
| Jonathan Ravens | JPMorgan | Hampton Bays, NY 11946 |
| Patricia Russo | JPMorgan | Albertson, NY 11507 |
| Robert Snyder | JPMorgan | Warren, NJ 07059 |
| Tara Sweeney | JPMorgan | New York, NY 10003 |
| Bryan Weiss | MediManager | Fort Worth, TX |

[2] Maria Ruiz's city and state of residence could not be identified, but as of 2004, she was employed in Chicago, Illinois, so that city and state has been utilized for purposes of this chart.

ADDRESS INFORMATION FOR CREDIT SUISSE EMPLOYEES,
LLOYDS EMPLOYEES, AND NON-PARTIES DEPOSED IN NCFE NOTEHOLDER CASES

4/19/2012

| Name | Affiliation | City and State of Residence[1] |
|---|---|---|
| Ed Bankole | Moody's | Maplewood, NJ 07040 |
| William Black | Moody's | New York, NY 10024 |
| Mack Caldwell | Moody's | New York, NY 10003 |
| Jay Eisbruck | Moody's | New York, NY 10023 |
| Irina Faynzilberg | Moody's | Plainfield, NJ 07060 |
| Greg Haesler | Moody's | Plainview, NY 11803 |
| Robert Young | Moody's | Madison, NJ 07940 |
| Jon Beacham | NCFE | Grosse Point Park, MI 48230 |
| Jessica Bily | NCFE | Xenia, OH 45385 |
| Sherry Gibson | NCFE | Columbus, OH 43206 |
| Chris Long | NCFE | Delaware, OH 43015 |
| Natalie Long | NCFE | Delaware, OH 43015 |
| Vincent Margello | NCFE | Powell, OH 43065 |
| Paul Jenison | Paine Webber | Princeton, NJ 08540 |
| Stanley Haines | PhyAmerica | Greensboro, NC |
| Cary Purcell | Purcell & Scott | Columbus, OH 43085 |
| Peggy Scott | Purcell & Scott | Dublin, OH 43017 |
| Mark Totten | Purcell & Scott | Columbus, OH 43220 |
| Cynthia Collins | PwC | Winnetka, IL 60093 |
| Harry Farver | PwC | Galena, OH 43021 |
| Robert Panda | PwC | Reynoldsburg, OH 43068 |
| Kimberly Smith | PwC | Aurora, CO 80016 |
| Press Southworth | PwC | Columbus, OH 43215 |
| Kevin Fechtmeyer | Shattan Group | Scottsdale, AZ 85266 |
| Elliot Rothstein | Shattan Group | New York, NY 10009 |
| Craig Staub | Shattan Group | Garden City, NY 11530 |